DAVIS *v.* THE STATE.

No. 16405.   NOVEMBER 17, 1948.

*R. A. Moore, A. J. Tuten,* and *D. C. Sapp,* for plaintiff in error.
*Eugene Cook, Attorney-General, J. R. Walker Jr., Solicitor-General, H. J. Quincey, Gibson & Maddox, E. L. Reagan* and *John Sammons Bell, Assistant Attorneys-General,* contra.

WYATT, Justice. ■ The evidence offered by the State makes a case of murder. There being ample evidence to warrant the verdict, the general grounds of the motion for new trial are without merit.

■ Special grounds one and two of the motion for new trial are based upon newly discovered evidence as to the disqualification of one of the jurors who tried the defendant. These grounds of the motion are supported by the several affidavits required, and disclose that the juror in question was related to the prosecutor within the 9th degree, but not within the 6th degree, as calculated by the rules of the civil law.

Prior to the act approved March 28, 1935 (Ga. L. 1935, p. 396), the juror in question would have been disqualified under decisions rendered by this court. But this act, which is now codified as § 59-716 of the annotated Code, reduced the relationship which would disqualify a juror to the 6th degree. The act is entitled, "An act to further define the qualifications of judges and jurors in all courts of this State, and to define what relationship to interested parties shall disqualify them from serving," and provides: "All judges, grand and trial jurors in the courts of this State shall be disqualified to preside, act or serve, in any case or matter, when such judge or juror is related by consanguinity or affinity to any party interested in the result of the case or matter, within the sixth degree, as computed according to the civil law; and relationship more remote shall not be a disqualification."

It is contended by the plaintiff in error that the act is unconstitutional because it is violative of article 3, section 7, paragraph 8 of the Constitution of 1945 (Code, Ann., § 2-1908), which prohibits the passage of a law that refers to more than one subject-matter, or contains matter different from what is expressed in the title of the act; and article 3, section 7, paragraph 16 (Code, Ann., § 2-1916), which provides that no law or section of the Code shall be amended or repealed by mere reference to its title or to the number of the section of the Code.

The first constitutional attack on the statute is not properly raised, and can not be considered by this court, because, while the statute and provision of the Constitution alleged to have been violated are both specified, the plaintiff in error has failed to show *wherein* the statute violates the constitutional provision.

*Price* v. *State,* 202 *Ga.* 205 (42 S. E. 2d, 728) ; *Williams* v. *McIntosh County,* 179 *Ga.* 735 (2) (177 S. E. 248).

It is insisted by the plaintiff in error that the second constitutional provision cited is violated by the statute in question because no reference is made in the title to the act of February 28, 1856 (Ga. L. 1855-6, p. 230, Code, § 59-804), which provides that a juror may be objected to upon the ground "that he is so near of kin to the prosecutor, or the accused, or the deceased, as to disqualify him by law from serving on the jury;" and it is further insisted that no reference is made "to the decisions of the Supreme Court," which prior to 1935 had declared that a juror related within the 9th degree was disqualified.

With reference to the first contention, suffice it to say that the act in question and the previous act of 1856 (Code, § 59-804) are in perfect harmony. The act of 1935 neither repealed nor amended § 59-804. It merely did what the Supreme Court, in the absence of any statutory law on the subject, had previously done, that is, established the degree of relationship which would disqualify a juror, and § 59-804 is still in full force and effect.

Prior to 1935 there existed no statutory law declaring the relationship which would disqualify a juror in a criminal case; but by the decisions of this court the rule had been established that relationship within the 9th degree as calculated by the rules of the civil law would disqualify such a juror. *Watkins* v. *State,* 125 *Ga.* 143 (53 S. E. 1024) ; *O'Berry* v. *State,* 153 *Ga.* 644 (113 S. E. 2). These judicial decisions had never been codified. Hence, in establishing a rule of disqualification by the act of 1935, the legislature was doing what this court had previously done, in the absence of any statutory law on the subject. This the legislature had a right to do; and it was under no duty to cite the many decisions of this court which the legislation abrogated. There is no constitutional or statutory requirement that the legislature cite decisions of the court which may be changed, modified, or abrogated by legislative enactments.

It is unnecessary to consider the validity of the act insofar as it pertains to the disqualification of judges, because the act, insofar as it relates to jurors, is not unconstitutional for the reasons assigned; and it is well settled that, where a part of an act is valid and a part unconstitutional the valid part of the act will

be upheld "when it is reasonably certain that to do so will correspond with the main purpose which the legislature sought to accomplish by its enactment, if, after the objectionable part is stricken, enough remains to accomplish that purpose." *Cain* v. *Smith*, 117 *Ga.* 902 (44 S. E. 5).

■ Special grounds three and four relate to the admission of a statement made by the deceased and introduced by the State as a dying declaration.

During the course of the trial the following colloquy occurred among counsel and the court: "Mr. Gibson (of counsel for the State): If Your Honor please, I want to offer a dying declaration made by Mr. Carter. Mr. Sapp (counsel for the defendant): We want the jury excluded. There is a serious question as to its admissibility. The Court: I don't remember any evidence of dying declarations, except the doctor, but he didn't state what it was. Mr. Gibson: But he stated that I took it, and I now want to put it in. Mr. Sapp: He didn't state he took a dying declaration. The Court: It couldn't be put in without proof about it. Mr. Gibson: Yes, sir. We want to make the proof. The doctor swore that he knew he was dying and he told him he would die. Mr. Sapp: No, that is not the evidence. The Court: Well, you can offer your proof. Mr. Gibson: Well, we have proof, in addition to that of the doctor. The Court: The doctor didn't testify what the dying declaration was. Mr. Gibson: No, sir. I have that here. The Court: You can offer it, if any you have. Mr. Gibson: Do you want the jury retired? Mr. Sapp: I want the jury retired until the question is thrashed out as to its admissibility. The Court: I think the doctor's testimony is sufficient to admit a dying declaration, if there is one."

The last expression of the court was not an expression of opinion "as to the probative value of the alleged dying declaration and the weight and credit that should be given" it, as contended by the plaintiff in error. The court's ruling was accompanied by qualifying language, clearly indicating that the court had no intention of stating or intimating that a dying declaration had actually been made.

Preceding the colloquy quoted, a witness for the State, Dr. Dan Jordine, had testified as follows: "A. He (the deceased) made no statement as to how this happened other than he got shot.

He didn't tell me what the circumstances were. I didn't ask him. I gave permission to Mr. Gibson to get a statement from him. Q. State whether or not at that time he was in the article of death. A. What is the article of death? Q. The article of death is that last few hours prior to death, when one is conscious of impending death. A. Yes, he thought he was going to die. Q. He thought he was going to die. But I mean by that, was he in the article of death, and also thought he was going to die. A. He thought he was going to die, and I was pretty sure of it. I don't know about the article of death, now." The doctor further testified that he had no hope for the deceased. This testimony was with reference to a condition existing soon after the shooting occurred and at the time the alleged dying declaration was made. The deceased lived for more than a week thereafter, dying on November 28. Other evidence offered by the State showed that the right arm of the deceased was almost shot off, requiring its amputation. Another load of shot struck the deceased in the back, severing his spinal cord, from which wound he died. The deceased, in answer to questions propounded by John S. Gibson, later of counsel for the State, stated at the time the alleged dying declaration was made: "My name is J. W. Carter. Looks like somebody shot me. Thomas Davis shot me. I am in bad shape to live. I reckon it is my opinion that I am going to die. It does not tire me to talk. Q. J., of course none of us know what is going to happen, but, knowing your condition, we would love for you to say, if we ask you, if you are going to die. We would like for you to answer it yes or no. A. Yes."

The deceased then made a lengthy statement as to the cause of his death and the person who killed him. We deem it unnecessary to quote the statement, but do observe that some of the statement was irrelevant and immaterial, but there was no objection to it, or any portion of it, upon this ground.

The admission of the dying declaration was objected to upon the grounds: (a) it did not appear that the deceased was in the article of death and conscious of his condition; (b) the statement was too remote from the event of death; and (c) the statement was elicited by questions and was not, therefore, made voluntarily.

In *Johnson* v. *State*, 169 *Ga.* 814 (3) (152 S. E. 76), this court

held: "Where the evidence disclosed that the defendant on Christmas day shot the deceased with a pistol, the bullet entering the left side of the deceased just above the hip and severing the spinal cord, and where on the second day after the shooting the deceased made a declaration, stating to the person to whom it was made that he was not going to get well, and where he died about 2 months thereafter from sepsis and exhaustion as the result of the severance of his spinal cord, such facts made a prima facie case that he was in extremis and was conscious thereof, and was sufficient to authorize the judge to admit such dying declaration to the jury." The court further held: "Consciousness on the part of the deceased that he was dying and was actually in extremis may be inferred, not only from his statements, but also from the nature of the wound and other circumstances. *Campbell v. State*, 11 *Ga.* 353 (3); *Dumas v. State*, 62 *Ga.* 58 (2); *Washington v. State*, 137 *Ga.* 218 (73 S. E. 512); *Fitzpatrick v. State*, 149 *Ga.* 75 (99 S. E. 128); *Bass v. State*, 152 *Ga.* 415 (8) (110 S. E. 237). The actual period of survival after making the declaration is not controlling. The necessary element is the declarant's expectation; and the subsequent duration of life, whatever it may turn out to be, has no relation to his state of mind when he made the declaration. 3 Wigmore, Ev. 171, § 1441. The question does not depend upon the length of time between the declaration and the death of the declarant, but upon the declarant's mind at the time of the declaration, and his belief that he is in a dying state." See also *Emmett v. State*, 195 *Ga.* 517 (25 S. E. 2d, 9); *Parker v. State*, 197 *Ga.* 340, 348 (29 S. E. 2d, 61).

If the preliminary statement made by the deceased as to his condition, in answer to questions, may be construed as lacking definiteness as a statement that he was conscious of the fact that he was going to die, this would not necessarily rebut the other evidence and circumstances from which it could have been inferred that he believed he would die. *Parker v. State*, supra. As stated in the *Emmett* case, supra, "The present case is distinguished by its facts from *Howard v. State*, 144 *Ga.* 169 (86 S. E. 540), where, in reply to a question as to whether he was going to die, the declarant said he was, 'If they did not do something for him,' and made other statements of similar import. We also

consider the instant case as being materially different from *Mitchell* v. *State*, 71 *Ga.* 128 (2), which has been cited and relied on as practically controlling. In that case, the injury from which the declarant was suffering was such as to deprive him of consciousness that he was even wounded, and it required much effort to convince him of this fact. Other circumstances were mentioned, and the decision was finally predicated upon a combination of circumstances, such as we do not find in the instant case." In *Roe* v. *State*, 164 *Ga.* 95, 96 (2) (137 S. E. 824), as in the *Howard* case, the language of the deceased as to his condition was qualified, it being to the effect that he was going to die if something was not done for him. Thus, these declarations showed on their face that he had not abandoned all hope of living.

That the statement of the deceased was elicited by questions propounded to him by the witness who testified as to the dying declaration, is not sufficient reason to exclude the statement. *Smith* v. *State*, 9 *Ga. App.* 403 (3) (71 S. E. 606); *Brinson* v. *State*, 22 *Ga. App.* 649 (1) (97 S. E. 102); *Park* v. *State*, 126 *Ga.* 575 (3) (55 S. E. 489). Other reasons urged in the amended motion for new trial as to why the dying declaration was inadmissible need not be considered, since it appears that none of the contentions now urged were made the basis of an objection on the trial of the case.

The preliminary evidence was sufficient to establish a prima facie foundation for the admission of the testimony as to statements made by the deceased and offered by the State as dying declarations, and no error is made to appear in the admission of such evidence.

■ The trial judge charged the jury as follows: "Declarations by any person in the article of death who is conscious of his condition as to the cause of his death and the person who killed him shall be admissible in evidence in a prosecution for the homicide. When evidence has been admitted as to what is claimed to be a dying declaration, it becomes a question of fact for the jury to determine whether such declaration was, in fact, made by the deceased; secondly, if made, whether the deceased at the time of the declaration was in the article of death, whether he was conscious of that condition. If the jury believe that a dying declaration was made by the deceased as to the cause of his death and

the person who killed him, and that the deceased was in the article of death and conscious of that condition at the time of the declaration, the jury would consider it in the light of all the facts and circumstances of the case, and give it such weight and credit as they think it is entitled to receive. On the other hand, if the jury should not believe that a dying declaration was made by the deceased as claimed, or, if made, that the deceased was not in the article of death at the time it was made; or, if in the article of death, was not conscious of that condition, the jury would give no consideration to the evidence with respect to the alleged dying declaration. In determining whether the deceased was in the article of death at the time of an alleged dying declaration, the jury may consider the nature of the wound, the deceased's condition. On the question of the deceased's consciousness as to his condition, the jury may consider other evidence than the deceased's own declarations. Evidence as to the character of the wound and the conduct and sayings of the deceased may be considered by the jury. Dying declarations should be received with great caution, and the bias, the feeling, and the physical and mental condition of the declarant, as well as the credibility of the alleged declarations, should be weighed by the jury. Such declarations must not be considered by the jury unless they are satisfied from the evidence that they were made by the declarant at a time when he was in a dying condition and was conscious of that condition."

This entire charge is excepted to upon the grounds: (1) that it was argumentative and did not limit the consideration of the jury to the sole question for which dying declarations are admissible, namely, the cause of death and the person who did the killing, but allowed the jury to consider irrelevant and immaterial portions of the statement made by the deceased; and (b) it was not adjusted to the proven facts and circumstances.

The charge is not subject to the criticisms lodged against it. The trial judge instructed the jury generally as to their proper function in considering evidence of dying declarations, and a portion of the charge, which is excepted to as a whole, is in the exact language of the Code, § 38-307. It is not contended that the charge is erroneous as an abstract proposition of law. No objection was urged to the irrelevant matter contained in the

statement made by the deceased; and if a further or more specific instruction was desired as to the limited purpose for which dying declarations should be considered by the jury, a written request should have been made. See, generally, *Parker* v. *State*, supra; *Rouse* v. *State*, 183 *Ga.* 551 (2) (188 S. E. 904); *Gibbs* v. *State*, 190 *Ga.* 207 (3) (9 S. E. 2d, 248); *Kalb* v. *State*, 195 *Ga.* 544 (5), 554 (25 S. E. 2d, 24). In *Johnson* v. *State*, 72 *Ga.*'679, this court held a general charge on dying declarations not erroneous as against the criticism that it "failed to call the attention of the jury to the character and weight of such evidence, or what facts could be proved by such declarations."

For the foregoing reasons, the trial court did not err in overruling the motion for new trial.

*Judgment affirmed.    All the Justices concur.*